# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

HAROLD FORD

Crim. No. 06-643

Pollak, J.                                                    April 23, 2009

## OPINION

Before the court is defendant Harold Ford's motion to set aside the verdict on count one of the government's two-count indictment.  A jury found Ford guilty of distributing five or more grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(b), on November 10, 2005 (Count 1of the indictment), but acquitted him of count two, distributing five or more grams of cocaine base in a separate incident on November 17, 2005 (Count 2).  Ford moves for a judgment of acquittal on count one, pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, contending that there was not sufficient evidence to support the jury's guilty verdict.  Alternatively, in his Rule 29 motion, Ford seeks acquittal on Count 1 on grounds of prosecutorial misconduct.[1]

---

[1]In moving for acquittal due to prosecutorial misconduct, Ford mistakes his remedy.  A finding of prosecutorial misconduct would call for setting aside the verdict with a view to retrial (Rule 33(a)), not entering a judgment of acquittal.

## I. Background

In November 2005, a Drug Enforcement Administration ("DEA") task force composed of DEA agents and local police officers was investigating drug trafficking activities in Coatesville, Pennsylvania.  Eleven months later, in October 2006, members of the task force arrested Harold Ford; in November 2006, a grand jury returned a two-count indictment.[2]  The charges were based on drugs allegedly distributed to a confidential informant, Kevin McKinley.

## II. Sufficiency of the Evidence

Ford argues that the evidence presented to the jury was insufficient to prove, as the indictment charged, that he distributed "cocaine base ('crack')" on November 10, 2005. "In addressing this claim," the jury's verdict must be upheld "if there is substantial evidence from which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Miller*, 527 F.3d 54, 60 (3d Cir. 2008) (internal quotation marks omitted). This inquiry requires that the court "interpret the evidence in the light most favorable to the government as the verdict winner, and do[es] not weigh evidence or determine the

---

[2] Specifically, the grand jury charged that (1) "[o]n or about November 10, 2005," Ford "knowingly and intentionally distributed approximately 5 grams or more . . . of a mixture and substance containing a detectable amount of cocaine base ('crack')," and (2) "[o]n or about November 17, 2005," Ford "knowingly and intentionally distributed approximately 5 grams or more . . . of a mixture and substance containing a detectable amount of cocaine base ('crack')."  Docket No. 10.

credibility of witnesses in making [its] determination." *Id.* (citations and internal

quotation marks omitted).

**A.**

The evidence relevant to the count-one distribution charge is as follows: In the fall

of 2005, the DEA task force obtained the cooperation of a then-confidential source,

Kevin McKinley, in staging undercover drug purchases. McKinley, a Coatesville resident

with a lengthy criminal history, including a conviction for drug distribution,[3] had been

arrested on September 5, 2005, and again on October 31, 2005, for distributing crack

cocaine. Docket No. 80 (Transcript of Trial, January 25, 2008) at 64. One of McKinley's

arresting officers on October 31, Corporal Chris McEvoy, a Coatesville narcotics officer

working with the task force, solicited McKinley's cooperation with the task force's

investigation. DEA Agent Brent Wood, who supervised the task force's investigation,

testified that, in exchange for his cooperation, McKinley was promised that he would not

face state or federal charges in connection with the September and October 2005 arrests.

Docket No. 80 (Transcript of Trial, January 25, 2008) at 167.

McKinley's cooperation began with an interview on November 7, 2005 about drug

trafficking in Coatesville. The interview was conducted in part by Sergeant William

---

[3] McKinley testified that, in June 1997, he pled guilty to distributing crack cocaine
"[o]n a number of occasions." Docket No. 80 (Transcript of Trial, January 25, 2008) at
60.

Farley, an officer of the University of Pennsylvania Police Department ("UPPD").

Sergeant Farley began working for the UPPD in 2001, after having spent a year working

with the park police in Delaware County.  Docket No. 79 at 39.  At the time that Sergeant

Farley interviewed McKinley, in 2005, Farley was assigned to a DEA task force

concurrently with his UPPD responsibilities.  Docket No. 79 at 39.  On November 10,

2005, based on information obtained during the November 7 interview, Sergeant Farley

fitted McKinley with a recording device and listened as McKinley made several calls to

negotiate drug purchases.[4]  Docket No. 79 at 39-42.

     One of these calls, which was played for the jury during Sergeant Farley's cross-

examination, was made to Joe Martinez, a local drug dealer, at 11:49 a.m.  During this

call, McKinley arranged to purchase a half-ounce of crack cocaine in about forty minutes.

Docket No. 79 at 81-83.  According to Sergeant Farley's testimony, McKinley's

conversation with Martinez included discussion of both the quantity and the price of the

drugs that were to be purchased.  Docket No. 79 at 83, 89.  McKinley also called another

local drug dealer, Fredrick ("Freddie") Williams, to arrange the purchase of crack

cocaine.

---

    [4] Sergeant Farley testified that, while he could hear McKinley's part of these
telephone conversations, and the recordings included each speaker in a telephone
conversation, Sergeant Farley could not himself hear the party speaking at the other end
of the line.  Docket No. 79 at 42.

-4-

McKinley made a third call, at approximately 11:55 a.m.  Docket No. 79 at 83-85.

This conversation was played for the jury during Sergeant Farley's direct examination.

The jury was given a transcript of the conversation that read as follows:

> SPEAKER 1: Hello
> SPEAKER 2: Yo where you at?
> SPEAKER 1: I am just pulling up I just got here they had me there all morning man.
> SPEAKER 2: Oh you just now . . . how did you make out?
> REDACTED
> SPEAKER 2: I am ready to come down there, I need you man
> SPEAKER 1: What's up?
> --
> SPEAKER 2: I need that I need that A-stem
>                    OR
>                    I need that I need that H-town[5]
> SPEAKER 1: Alright
> SPEAKER 2: Where you at?
> SPEAKER 1: I am down at the Midway ordering my grill right now.
> SPEAKER 2: Alright is my sister down there . . . hugh
> SPEAKER 1: She ain't here
> SPEAKER 2: Alright I will be down
> SPEAKER 1: Alright

Gov't Exh. N-29.  On direct examination, McKinley testified that he was the person

_____

[5] The transcript that the government had originally drafted reported Speaker 2 as saying "I need that I need that A-Stem."  Docket No. 78 (Transcript of Trial, January 23, 2008) at 32.  Prior to trial, the government edited the transcript to read: "I need that I need that H-Town."  McKinley testified at trial that "H-Town" is slang for half an ounce of crack cocaine, Docket No. 80 at 24, and that a pipe used to smoke crack cocaine is referred to as "a stem."  Docket No. 80 at 35.  At a pretrial hearing, I directed the government to revise the transcript to be presented to the jury to include both possible interpretations of the recording.  Docket No. 78 at 49-50.

identified as "speaker 2," and Harold Ford was "speaker 1."  Docket No. 80 at 24.

After these conversations, McKinley, outfitted with a concealed transmitter and recording device, and supplied with $400 in "buy money," was dropped off in an alley near the Midway Diner, the restaurant referred to in the above conversation.  Docket No. 79 at 46-47, 157.  McKinley walked to the Midway Diner and arrived there at approximately 12:20 p.m., according to Sergeant Farley's testimony.[6]  At trial, McKinley testified that Ford was standing in front of the Midway when he arrived, and that he and Ford discussed the purchase of half an ounce of crack cocaine.  According to McKinley, Ford instructed McKinley to wait while he went to get the drugs; McKinley further testified that he "remember[ed] [Ford] taking too long," and called him to see where he was.[7]  Docket No. 79 at 158.

However, Sergeant Farley, who had listened to all of McKinley's recorded

---

[6] Sergeant Farley's testimony was based on his contemporaneous notes of what was being reported to him by other members of the task force.  Though he did not personally observe McKinley during the transaction, Sergeant Farley testified that, while the operation was taking place, he took approximately four pages of notes of what other members of the task force were reporting to him.  Docket No. 79 at 71-72.  Sergeant Farley also testified that, after the transaction, took place, he met with McKinley, dictated McKinley's account of the transaction, and had McKinley read and correct any inaccuracies in the transcribed account.  Docket No. 79 at 48-49.

[7] This testimony is consistent with the signed statement that McKinley gave to Sergeant Farley, at approximately 1:30 pm on the day in question: "We talked about the purchase of one-half ounce of crack. [Ford] then told me that he had to go to Merchant Street to get the half ounce."  Docket No. 79 at 94-95.

conversations on November 10, testified on cross-examination that there was no record of a conversation between McKinley and Ford discussing the quantity or price of drugs. Docket No. 79 at 93, 95-96.  Sergeant Farley also testified that he had no record of McKinley calling Ford on his cell phone while McKinley was waiting at the Midway Diner. Docket No. 79 at 96.  Sergeant Farley further testified that McKinley could not turn off the transmitter or recording device that he was carrying, and that all conversations between McKinley and Ford should have been recorded.  Docket No. 79 at 76.

McKinley testified that he had not gone inside the Midway Diner before meeting Ford or while waiting for him to return.  Docket No. 79 at 160.  Sergeant Farley, however, testified that, according to his contemporaneous notes (see footnote 6, *supra*), Kevin McKinley, on arriving at the Midway Diner, entered and remained inside for less than two minutes.[8]  Docket No. 79 at 87-88.  No members of the task force were conducting surveillance inside the Midway Diner.  Docket No. 79 at 87-88.

McKinley testified that, about five or ten minutes after he called Ford while waiting for him outside the Midway Diner, Ford returned.  "[Ford] came back walking down the street and came back to me in front of the Midway, and walked west [to] east on

---

[8] Corporal McEvoy, who was conducting surveillance of McKinley, testified that he could not recall whether or not McKinley went inside the Midway Diner at any time. Docket No. 80 at 125.

the Midway, like off to the side back towards the alley I came from.  That's when he

handed it to me."  Docket No. 79 at 158.  McKinley testified that he paid $400 to Ford

and received half an ounce of crack cocaine, Docket No. 79 at 160-61, and that the

transaction occurred through a handshake:  "He shakes my hand, give me the stuff, I

shake his hand back, give him the money."  Docket No. 79 at 161.  Overall, according to

McKinley's testimony, twenty or twenty-five minutes elapsed between initially meeting

Ford outside the Midway Diner and the transaction taking place.  Docket No. 79 at 159.

     Corporal McEvoy testified to having observed Ford and McKinley outside the

Midway Diner.  Driving in a vehicle different from Sergeant Farley's (six task force

vehicles were involved in the operation, Docket No. 79 at 44-45), Corporal McEvoy

staked out a position about a block and a half to two blocks east of the Midway Diner to

conduct surveillance of McKinley.[9]  Docket No. 80 at 98-100.  Corporal McEvoy

_____

    [9] In her closing argument, Ford's counsel said that the alleged transaction between
Ford and McKinley was "at least a block and a half to two blocks from where [McEvoy]
was situated."  Docket No. 81 (Transcript of Trial, January 28, 2008) at 52.  The
government charges Ford's counsel with misstating Corporal McEvoy's testimony, and
claims that Corporal McEvoy testified that he was "less than four feet from the two men"
when they shook hands and, according to the government, engaged in the drug
transaction.  Docket No. 89 at 9 (citing Docket No. 80 at 102).
    The government's characterization of Corporal McEvoy's testimony is incorrect.
Corporal McEvoy testified that he began observing McKinley from a position
"approximately two blocks east of th[e] bar" where McKinley met Ford, and that he
moved his vehicle so that he was eventually observing McKinley from "approximately a
block and a half" from the bar.  Docket No. 80 at 98-100.  Corporal McEvoy testified that
(continued...)

testified, on cross-examination, that this position was across a "very busy intersection" from the Midway Diner and that there were always "a lot of people on the street" at the location. Docket No. 80 at 126-27. According to Corporal McEvoy, he saw McKinley walk toward the Midway Diner and then meet and engage in a conversation with Ford. Docket No. 80 at 100. Corporal McEvoy said that he observed Ford walking north from the restaurant toward Merchant Street. Docket No. 80 at 100-01. Then, according to Corporal McEvoy, he lost sight of Ford for "a number of minutes" but saw Ford once more as he walked south and met McKinley again in front of the Midway Diner. Docket No. 80 at 101-02. Corporal McEvoy testified that Ford and McKinley then shook hands and separated after a few more seconds. However, Corporal McEvoy acknowledged that he did not actually observe drugs or money transferred during this handshake, but added that, in his experience, shaking hands is "indicative of a drug transaction."[10] Docket No.

---

[9](...continued)
he saw Ford meet McKinley in front of the bar and then leave for a few minutes. Corporal McEvoy then testified that, when he again saw Ford and McKinley together in front of the bar, they were approximately four feet or less from each other. Docket No. 80 at 102.

[10] Corporal McEvoy testified that he took no notes of his observations on November 10 and, concomitantly, that he had no contemporaneous record of witnessing a handshake between Ford and McKinley. Sergeant Farley testified that neither his contemporaneous notes of what was being reported to him by the task force members, nor his later reports, based on discussions with his fellow officers, indicated that any of the task force members witnessed an exchange between Ford and McKinley on November 10. Docket No. 79 at 73-74.

80 at 119.

During Sergeant Farley's cross-examination, Ford's counsel played a recording of a 12:46 p.m. conversation between McKinley, who was then still in the vicinity of the Midway Diner, and a person the task force could not identify.  Docket No. 79 at 89-91. The recording included discussion of prices — "350, 370, 380 " dollars — and references to "scales."  Docket No. 79 at 91.  McKinley testified that this conversation occurred while he was waiting for Ford to return, and that he and the speaker in the conversation were discussing prices for a half ounce of crack cocaine. McKinley further testified that he did not remember the name of the person with whom he had this conversation, but that the person was "some young guy."  Docket No. 80 at 18-20.

A 12:48 p.m. conversation between McKinley and other speakers, one of whom McKinley identified as Ford, was played for the jury while McKinley was on the stand, and a transcript of the conversation (which Sergeant Farley testified to being accurate, (Docket No. 79 at 68-69)), was presented to the jury.[11]  According to McKinley's

---

[11] The transcript presented to the jury, which omits the speakers' identities, reads as follows ("-" denotes a break in the sentence and, at times, a change in the speaker):

> -I will be right with you . . .
> -Hey, what's up, you want to go over there . . . hit me man.
> (Speakers walking unintelligible conversation)
> -That's what I am telling you like
> -He's nuts . . . it's a rap.

(continued...)

testimony, the conversation began with his calling to Ford ("Forte," pronounced "forty")

as he was walking from the highway:  "Oh man you own the highway, you own the

highway.  Forte I want . . . you the big man down here, you worrying about comm' on

comm' on man."  Gov't Exh. N-28.  Then, based on McKinley's identification of the

---

[11](...continued)
        -What's this?
        -Oh man you own the highway, you own the highway. Forte I want . .
        . you the big man down here, you worrying about comm' on comm'
        on man
        -I don't got nothing
        -Where you going to be at . . . you had coke here
        -No the cops . . . listen I was driving and they started following me, so
        I had to go and stash it
        -How much, how much did you stash?
        -Nine ounces
        -I did . . . I cooked it up
        -Did you get back? You stashed nine ounces
        -I was scared . . . I mean it wasn't outside or nowhere or nothing
        -It was outside
        -I got it listen . . . I threw it in the . . .
        -What's up man? Listen I am going to take care of this and you know
        and I will be back man. Probably go get something to eat . . . real
        good . . . real good though. . .
        -It's right there . . . right here . . . right there
        -I am not fooling with you at all . . . I can't . . . I was going to but . . .
        I am going to hit you up man, I am going up there and see how my
        mom
        -Alright, year, where is she at Glenwood?
        -No she just came home
        -OK

Gov't Exh. N-28.

speakers, Docket No. 80 at 21-22, 33, Ford explained to McKinley that he had no drugs

on him because he was forced to hide nine ounces of cocaine:

"I don't got nothing," Ford said.

"Where you going to be at . . . you had coke here," McKinley said.

Ford replied, "No the cops . . . listen I was driving and they started following me,

so I had to go and stash it"

McKinley responded, "How much, how much did you stash?"

"Nine ounces." Ford continued, "I did . . . I cooked it up. . . . I was scared . . . I

mean it wasn't outside or nowhere or nothing."  Gov't Exh. N-28; Docket No. 80 at

21-22, 33.

McKinley testified that this conversation occurred after Ford had brought him the

half-ounce of crack cocaine.   Docket No. 80 at 23.

After the transaction at the Midway Diner had been completed, McKinley returned

to the alley where he had been dropped off and got into the van with Sergeant Farley and

a task force detective.  Docket No. 79 at 161.  McKinley gave agents what he testified to

be crack cocaine.  Docket No. 79 at 161.  DEA Forensic Chemist Ken Fuentecilla later

tested and weighed the substance and, at trial, testified that the substance was 12.7 grams

of cocaine base.  Docket No. 79 at 125.  On cross-examination, Mr. Fuentecilla could not

identify the substance as "crack" cocaine, and could not provide a definition of "crack"

-12-

cocaine: "Cocaine base crack, it's – I guess the word crack is a street term.  So . . . none of my analysis are [sic] – you know, scientifically, crack means nothing to me really." Docket No. 79 at 132-33.  Mr. Fuenticilla was also unable to offer a distinction between "freebase cocaine" and "crack" cocaine:

> Q. Cocaine base, freebase is not referred to on the street as crack, correct?
> A. I don't know street terms.

Docket No. 79 at 133.  On further cross-examination, after some pressing, Mr. Fuenticilla acknowledged that his report of the substance did not indicate the presence of hydrochloride or bicarbonates.[12]  Docket No. 79 at 137.

**B.**

Ford makes two substantial-evidence claims.  First, Ford argues that there is not substantial evidence showing that he—rather than one of the other individuals from whom McKinley arranged to purchase drugs on November 10, 2005—distributed cocaine base to McKinley that day.  Alternatively, Ford argues that there is insufficient evidence from which to conclude that the substance that McKinley purchased that day was "crack," rather than another form of cocaine base.  For the reasons that follow, I find these

---

[12] As I will address in more detail below, the Sentencing Guidelines define "crack" cocaine as "a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form."  U.S.S.G. § 2D1.1(d).

arguments unpersuasive.

      **1.**

      In order to conclude beyond a reasonable doubt that Ford distributed cocaine base on November 10, a factfinder must credit Kevin McKinley's testimony. McKinley testified that, on November 10, outside the Midway restaurant, Ford gave him a half-ounce of cocaine base in exchange for $400. However, despite the task force's extensive surveillance of McKinley's activities on November 10, there are no recordings or contemporaneous documentation corroborating McKinley's testimony that, via a quick handshake, he and Ford exchanged drugs for money. The nearest thing to corroboration is Corporal McEvoy's testimony that, from across a "very busy intersection," he saw a handshake; but he did not see a transfer or drugs and money.

      Aside from McKinley's testimony that he purchased crack cocaine from Ford on November 10, the evidence that gives strongest support for the jury's verdict is the 11:55 a.m. telephone conversation that day between McKinley and Ford. Viewed in the light most favorable to the government, this call shows that Ford agreed to sell cocaine base to McKinley, and let McKinley know that he was at the Midway Diner. However, Ford and McKinley did not discuss when the transaction would actually occur and, minutes before this call was placed, McKinley called Joe Martinez, who specifically agreed to sell drugs to McKinley within forty minutes of the call. McKinley arrived at the Midway diner

approximately thirty minutes after this call to Martinez.  Hence, if one were to disbelieve

McKinley's testimony, but nonetheless credit the testimony of each of the other

government witnesses, the evidence would not support a finding beyond a reasonable

doubt that Ford, rather than Martinez or another individual, distributed cocaine base to

McKinley outside the Midway restaurant on November 10.

Moreover, in addition to McKinley's call to Martinez, other evidence casts doubt

on whether McKinley testified accurately that Ford, rather than another person,

distributed drugs to him outside the Midway restaurant.  According to Sergeant Farley's

contemporaneous notes, when McKinley arrived at the restaurant, he went inside, where

he was completely free from surveillance, for approximately two minutes.[13]  McKinley

---

[13] While McKinley testified at one point that he had not entered the restaurant, he
did so tentatively. On direct examination, McKinley testified:

> Q. And did you go into the Midway at any time during your –
> A. I don't remember. I might have. I might have stepped in there.
>    I might have stepped out.
> Q. Did you leave the general area?
> A. No.
> Q. Okay, so you were either in front of or went into the Midway
>    maybe?
> A. I was directly in front of it. I didn't go nowhere.
> Q. Okay. Do you recall if you went in or not or you're not sure?
> A. I didn't go in.

Docket No. 79 at 159-60.  During cross-examination, McKinley went on to testify as
follows:

(continued...)

-15-

then met Ford outside the restaurant and, after a moment, Ford left.  McKinley testified

that, when Ford first arrived at the restaurant, they discussed the price and volume of the

drug purchase.  Sergeant Farley testified, however, that all conversations between

McKinley and Ford should have been recorded, and that McKinley did not have the

ability to turn off the recording instruments that were concealed on him.  Likewise,

although McKinley testified to calling Ford while waiting for him to return to the

restaurant with the drugs, Sergeant Farley testified that there is no record of such a call

having been made. There is, however, a recorded conversation between McKinley and a

person whom McKinley did not identify at trial about the price of a half-ounce of crack

cocaine.  This conversation—which, according to McKinley, occurred while he was still

waiting for Ford to return with the drugs—took place at 12:46 p.m.

It is even more difficult to reconcile McKinley's testimony with what was next

_____

[13](...continued)
> Q. Now did you tell us yesterday that you never went into the
>     Midway Diner on November the 10th?
> A. I wasn't – two years ago – I wasn't sure of every movement. I
>     don't know if I briefly stopped in there or if I stayed outside.
>     But, I'm most likely positive I was outside the whole time.
> Q. Okay. So, you're most likely positive that you were outside the
>     whole time. So that, if Sgt. Farley testified that you went
>     inside, he would be mistaken?
> A. Probably so. It was two years ago to him too. He's probably
>     not sure of every movement too.

Docket No. 80 at 30-31.

recorded.  At 12:48 p.m., within two minutes of the drug negotiation between McKinley and the unidentified person, McKinley called out to Ford, who was walking from the highway ("Oh man you own the highway, you own the highway").  In this conversation, Ford explained to McKinley that he "don't got nothing," and that he was forced to "stash" nine ounces of cocaine because he was being followed by police.  While McKinley testified that the 12:46 pm drug negotiation occurred *before* he met Ford, he also testified that this 12:48 p.m. conversation—wherein Ford explains that he did not have any drugs with him—occurred *after* Ford dealt him a half-ounce of crack cocaine.  The government offered no explanation for this discrepancy.

If, in light of this evidence, one were to discredit McKinley's testimony that Ford distributed the drugs that McKinley purchased on November 10, the weight of the evidence would not support the jury's verdict of guilty on Count 1 of the indictment.  However, despite the jury's acquittal of Ford on Count 2, presumably manifesting jury rejection of McKinley's testimony with respect to the alleged November 17 distribution, I am precluded from assessing the credibility of McKinley's testimony that he purchased cocaine base from Ford on November 10.  *See Miller*, 527 F.3d at 60.

The jury's apparent non-crediting of McKinley's testimony about events on November 17 does not destabilize the jury's manifest crediting of McKinley's testimony regarding November 10.  The Third Circuit has cautioned that, in the context of a

-17-

sufficiency-of-the-evidence review, "[a] jury is free to believe part of a witness'

testimony and disbelieve another part of it[.]"  *United States v. Boone*, 279 F.3d 163, 189

(3d Cir. 2002) (internal quotation marks omitted).  Therefore, I must credit McKinley's

testimony as to the November 10 charge as true and, concomitantly, conclude that the

weight of the evidence supports the jury's verdict.  *See United States v. Frampton*, 382

F.3d 213, 222 (2d Cir. 2004) ("[T]he testimony of a single, uncorroborated eyewitness is

generally sufficient to support a conviction, and . . . such a principle has deep roots in our

system of justice.") (internal citations and quotation marks omitted).

Accordingly, under the "particularly deferential standard of review" that governs

sufficiency-of-the-evidence analysis, *see United States v. Kellogg*, 510 F.3d 188, 202 (3d

Cir. 2007) (internal quotation marks omitted), I conclude that there is substantial evidence

supporting the jury's determination that Ford distributed cocaine base on November 10.

## 2.

Ford also argues that, whether or not there is substantial evidence showing that he

distributed cocaine base on November 10, there is insufficient evidence from which to

conclude that he distributed "a mixture and substance containing a detectable amount of

cocaine base ('crack')," in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(b), as charged in

count one of the indictment.  "Crack," as the term is defined in the Sentencing Guidelines,

"is the street name for a form of cocaine base, usually prepared by processing cocaine

hydrochloride and sodium bicarbonate, and usually appearing in a lumpy rocklike

form."[14]   DEA Forensic Chemist Ken Fuenticilla testified, on cross-examination, that

--------------------------------------------------------------------

[14] The Third Circuit has explained the distinction between "crack" and "freebase," another form of cocaine base, as follows:

Cocaine is a naturally occurring substance that is derived from the leaves of the erythroxylon plant. *United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy*, at vi (1995) [hereinafter "*Special Report*" ]. There are five basic forms of the drug: coca leaves, coca paste, powder cocaine, freebase cocaine, and crack cocaine. *Id.* at 11.  There are three base forms of cocaine: coca paste, freebase cocaine, and crack cocaine. *Id.*  Coca paste, not usually imported into the United States, is "a chunky, off-white to light-brown, putty-like substance that exists primarily as an intermediate product in the processing of coca leaves into powder cocaine." *Id.*

Both freebase cocaine and crack cocaine are forms of cocaine base produced from powder cocaine. *Id.* at 13.  In this form, the powder cocaine has been "freed" from the salt substrate and is once again in a base form similar to that of coca paste. *Id.*  To create freebase cocaine, powder cocaine is dissolved in water and a strong alkaloid solution, typically ammonia is added, along with another organic solvent like ether. *Id.*  The use of this process was first documented in the 1970s, but "many resisted the freebasing process because of its complexity and potential danger. Ether, a highly volatile and flammable solvent, will ignite or explode if the freebase cocaine is smoked before the ether has evaporated entirely." *Id.*  Cocaine base prepared using the freebase method was replaced by the crack method. *See, e.g., United States v. Johnson*, 976 F.Supp. 284, 290 (D. Del.1997) ( "[F]reebase cocaine . . . seems to have outlived its utility with the emergence of crack cocaine.")

To produce crack cocaine, the powder cocaine is dissolved in a solution of sodium bicarbonate and water, which is then cooked, leaving a solid substance called crack cocaine. *Special Report* at 14.  "The crack cocaine is broken or cut into 'rocks,' each typically weighing from one-tenth to one-half a gram." *Id.*  This method is considered to be the most common method of producing cocaine base. *See United States v. Barbosa*, 271 F.3d 438, 462 (3d Cir. 2001).  "Crack" is not a chemical term; it describes a substance that results

(continued...)

while his tests of the substance distributed to McKinley on November 10 confirmed that it was cocaine base, the tests did not reveal the presence of bicarbonates. Moreover, while Sergeant Farley and McKinley referred to the substance in question as "crack," they do not appear to have described the properties of the substance at a level of detail necessary to demonstrate that they were referring to the form of cocaine base generally accepted to be "crack" cocaine.  Therefore, Ford argues, there is insufficient evidence that he distributed "cocaine base ('crack')," as charged in count one of the indictment.

Ford's arguments are misplaced.  The question whether Ford distributed "crack," as opposed to another form of cocaine base, has no bearing on whether he may be found liable for violating 21 U.S.C. § 841.  There is disagreement among the circuit courts as to whether any substance other than "crack" fits within the definition § 841 definition of "cocaine base."  The Third Circuit, however, "hold[s] that, while the term 'cocaine base'

---

(...continued)

> from a general method for making cocaine base out of powder cocaine.  *See United States v. Waters*, 313 F.3d 151, 156 (3d Cir. 2002).  The Sentencing Guidelines note, "'[c]rack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy rocklike form."  U.S.S.G. § 2D1.1(c), Note D.  *See also Waters*, 313 F.3d at 156.

*United States v. Brigman*, 350 F.3d 310, 312 -13 (3d Cir. 2003) (determining that, for purposes of calculating defendant's sentence under the then-mandatory sentencing guidelines, government had proved by a preponderance of the evidence that the defendant distributed "crack" cocaine), *abrogated by United States v. Booker*, 543 U.S. 220 (2005).

means only crack when a sentence is imposed under the Sentencing Guidelines, 'cocaine

base' encompasses all forms of cocaine base with the same chemical formula when the

mandatory minimum sentences under 21 U.S.C. § 841(b)(1) are implicated." *United*

*States v. Barbosa*, 271 F.3d 438, 467 (3d Cir. 2001).  Here, the government has

established that the substance distributed to McKinley on November 10 was cocaine base.

Therefore, whether or not the cocaine base distributed on November 10 was "crack,"

there was evidence submitted to the jury that was consistent with the charge that Ford

distributed cocaine base, in violation of 21 U.S.C. §§ 841(a) and (b)(1).

   The fact that the grand jury alleged distribution of "cocaine base ('crack')," and

that the government did not establish that the substance distributed was "crack," as

distinct from some other form of cocaine base, would have the potential to affect the

verdict only if the imprecision as to the form of cocaine base distributed could be thought

to constitute a substantial variance between the indictment and the evidence adduced at

trial.  *See United States v. McKee*,  506 F.3d 225, 231 n.7 (3d Cir. 2007)

("'[A]mendments [to an indictment] . . . occur when the charging terms of the indictment

are altered . . . .'  Variances occur when the charging terms are unchanged, 'but the

evidence at trial proves facts materially different from those alleged in the indictment.'  If

a variance between the indictment and the evidence 'does not alter the elements of the

offense charged, we will focus upon whether or not there has been prejudice to the

-21-

defendant.'") (quoting *United States v. Castro*, 776 F.2d 1118, 1121-22 & n.1 (3d Cir. 1985)).  Ford does not allege such a material variance, and I find none.

  **C.**

  In summary, I conclude that the government's evidence, if credited, would allow a reasonable juror to conclude, beyond a reasonable doubt, that Ford distributed five grams or more of cocaine base on November 10.  Therefore, a judgment of acquittal will not be entered.

**III. Prosecutorial Misconduct**

  Having concluded that Ford is not entitled to a judgment of acquittal, I turn to whether the verdict must be set aside due to prosecutorial misconduct.  Because Ford raised his misconduct claims post-trial, they are governed by Federal Rule of Criminal Procedure 33, under which the district court has the discretion to vacate a judgment of conviction "if the interest of justice so requires."  This "interest of justice" determination requires me to consider the propriety of the government's conduct and its effect on the verdict based on an independent assessment of the evidence.  *See United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) ("Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case.").

**A.**

Ford argues that the prosecutor engaged in a pattern of misconduct that included vouching for the credibility of the government's witnesses and lodging unfounded attacks on Ford's counsel–a pattern which, Ford argues, began during opening statements and culminated in the prosecutor's closing argument and, in particular, the closing-argument rebuttal.  Analysis of these claims involves a two-stage inquiry.  First, did the prosecutor's statements, considered in context, constitute misconduct?  Second, if misconduct occurred, was it so severe that it may have had an adverse influence on the jury's objectivity in arriving at a verdict?  *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial.").  Ford preserved his misconduct claims through contemporaneous objections at trial, including repeated requests for a mistrial, and I will therefore review the claims in accordance with the harmless error principles set forth in *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (holding that prosecutorial misconduct amounting to non-constitutional error "is harmless when it is *highly probable* that the error did not contribute to the judgment") (emphasis in original). *See also United States v. Vitillo*, 490 F.3d 314, 327 (3d Cir. 2007) (reviewing vouching

claims for harmless error when defendant "objected to the alleged vouching at trial and by

post-trial motion").

**B.**

While Ford alleges that the prosecutor engaged in misconduct throughout the

course of the trial, the focal point of my analysis will be the prosecutor's remarks during

the government's closing-argument rebuttal.  Ford's claim based on these remarks must

be understood in the context of a trial marred by considerable tension and, at times, open

hostility, between the prosecutor and the defense counsel.  Therefore, before addressing

Ford's misconduct claims, I will recapitulate portions of the record that place the

prosecutor's remarks in appropriate light.

**1.**

Two loci of tension between the parties were the testimony of Kevin McKinley

and Corporal McEvoy.  McKinley, the government's cooperator, had a lengthy criminal

history that included a conviction for crack-cocaine distribution,[15] a charge for making

terroristic threats in 2002, and, based on his having shot into the window of an occupied

vehicle, convictions in 2003 for reckless endangerment and carrying an illegal firearm.

Docket No. 80 at 62.  Seeking to make McKinley's background more palatable to the

jury, the prosecutor, in his opening argument, stressed that McKinley was to be respected

---

[15] *See supra* note 3.

for testifying at "the risk of persons who would have him not testify who would

intimidate him."  Docket No. 79 at 25.  I cautioned the prosecutor that this

characterization was "a little much."[16]  Then, in her opening argument, Ford's counsel

addressed McKinley's lengthy criminal history, which she characterized as a "lifetime of

crime," including "[r]obberies, stabbings, drugs, drugs, drugs, and more drugs," and

"carrying a gun, sticking up people, and terrorizing people with that gun."  Docket No. 79

at 29, 31-32.  This characterization prompted the prosecutor not only to object, but also to

---

[16]  My cautionary remark was prompted by an objection by Ford's counsel, in an
exchange that proceeded as follows:

> Mr. MCGETTIGAN: . . . Scrutinize [McKinley's] testimony and
> consider it, but give him the respect that is due to a person who at
> some apprehension and risk to himself cooperated in [sic] the
> Government—with the Government in addressing the serious
> problem of drug sales and at risk—
> MS. LEFEBER: Objection, Your Honor.
> THE COURT: Overruled.
> MR. MCGETTIGAN: And notwithstanding that this has not made
> him a popular person in the community of Coatesville and at the risk
> of persons who would have him not testify who would intimidate
> him—
> MS. LEFEBER: Objection, Your Honor.
> MR. MCGETTIGAN: —to come in here and testify—
> MS. LEFEBER: Objection.
> THE COURT: I think that's a little much, Mr. McGettigan.
> MR. MCGETTIGAN: I'll move on, Your Honor.
> THE COURT: Yeah, let's leave that alone. All right?

Docket No. 79 at 24-25.

accuse Ford's counsel, in open court, of "making something up."[17]   Docket No. 79 at 32.

Pursuant to both parties' objections, at sidebar I admonished both parties for their

comments, stating that "Mr. McGettigan [the prosecutor] doesn't need to say that, and I

don't think we need to talk about terrifying . . . the population."[18]   Docket No. 79 at 32.

---

[17] The government accuses Ford's counsel of fabricating aspects of McKinley's
criminal history during this argument.  While Ford's counsel was permitted to
cross-examine McKinley about his convictions for drug distribution and shooting into the
window of an occupied vehicle, counsel's opening argument did allude to aspects of
McKinley's criminal history that she was ultimately barred from inquiring into at trial.
However, she had a good-faith basis for making these allusions.  At one of several pretrial
conferences held the week before trial for the purpose of addressing discovery disputes,
the prosecutor confirmed that the government had not produced evidence of Kevin
McKinley's criminal history, despite the defendant having requested the material in
discovery motions filed several months before trial, pursuant to *Giglio v. United States*,
405 U.S. 150 (1972).  Docket No. 76 (Transcript of Pretrial Conference, January 17,
2008) at 10-13.  (Ford's counsel represented, at these conferences, that the government
had also failed to produce other evidence to which the defendant was entitled, including
audible copies of the recordings that constituted the prosecution's primary evidence
against Ford.)  I directed the government to authorize the Chester County probation
department to produce a copy of McKinley's most recent presentence investigation
("PSI") report, which the government theretofore had not done.  At a subsequent pretrial
conference, after Ford received a copy of McKinley's PSI report, I granted Ford's counsel
permission to cross-examine Mr. McKinley, at trial, as to each of the arrests reported in
the PSI report.  Docket No. 78 at 11-12.  My subsequent evidentiary rulings at trial in part
limiting Ford's counsel's cross-examination of McKinley with regard to his prior
convictions were not entirely consistent with this earlier determination.

[18] The full exchange is as follows:

> MS. LEFEBER: The entire case depends on Mr. McKinley's word.
> The evidence will show that he's led a lifetime of crime, and his
> word can't be believed. Robberies, stabbings, drugs, drugs, drugs,

(continued...)

Later, during his direct examination of McKinley, the prosecutor posed the

following question to McKinley:

> Q. Okay, and I noticed you have difficulty walking up here. What's
> your present physical condition.
> A. I was shot.

Docket No. 79 at 142.  This inquiry drew a vigorous objection from Ford's counsel, who,

at sidebar, argued that the prosecutor was trying to intimate that McKinley was shot "in

retaliation for testifying here and [that] he's afraid of people."  Docket No. 79 at 143.

---

[18](...continued)

> and more drugs. That was how he supported himself, and every – all
> the time that he was wheeling and dealing drugs on the streets of
> Coatesville in front of the Midway Diner and VFW bar, he was
> carrying a gun, sticking up people, and terrorizing people with that
> gun.
> MR. MCGETTIGAN: Your Honor—
> MS. LEFEBER: But things change.
> MR. MCGETTIGAN: You're Honor, excuse me. Your Honor, I'm
> going to object. Counsel is—
> THE COURT: All right.
> MR. MCGETTIGAN: —making something up here.
> THE COURT: I don't think we need to pursue that.
> MS. LEFEBER: Could we ask Mr. McGettigan not to make
> statements like counsel is making something up. I think that's
> inappropriate.
> THE COURT: I don't think—I think Mr. McGettigan doesn't need
> to say that, and I don't think we need to talk about terrifying—
> MS. LEFEBER: Things—
> THE COURT: —the population.

Docket No. 79 at 31-32.

The prosecutor represented that he was simply trying to explain the cause of McKinley's obvious injury, and that he had "no intention of trying in any respect to impute [the shooting] to this defendant," or, at my prompting, to "anybody."  Docket No. 79 at 143.  I cut off the prosecutor's inquiry and issued the following instruction:

> THE COURT: I think that the jury can disregard the nature of the witness's injury. It doesn't figure into this case. He—we'll trust he recovers quickly.

Docket No. 79 at 144.

As McKinley's direct examination continued, the prosecutor twice, in front of the jury, accused Ford's counsel of inappropriate conduct.  First, during McKinley's direct examination, Ford's counsel successfully objected to several of the prosecutor's questions as leading.  After one of these successful objections, the prosecutor openly complained that Ford's counsel "doesn't understand what['s] leading."[19]  Docket No. 79 at 164.

---

[19] This exchange proceeded as follows:

> [BY MR. MCGETTIGAN] Q. Okay.  And eventually as a result of those phone calls, did you make a phone call and contact the defendant, Harold Ford?
> [MCKINLEY] A. Yes.
> MS. LEFEBER: Objection, Your Honor.  Can we like not lead the witness?
> MR. MCGETTIGAN: Your Honor, that's not a leading question.
> MS. LEFEBER: Just ask him who you called and—
> MR. MCGETTIGAN: Your Honor, with all due respect—
> MS. LEFEBER: —not spoon feed him?

(continued...)

Second, during McKinley's cross-examination, the prosecutor objected when Ford's

counsel inaccurately summarized part of McKinley's testimony.  In doing so, the

prosecutor accused Ford's counsel, in front of the jury, of "intentionally misstating the

testimony."  Docket No. 80 at 31.  I instructed the prosecutor that such "editorializing"

during the objections "is unnecessary."[20]  Docket No. 80 at 32.

---

[19](...continued)
　　　MR. MCGETTIGAN: Counsel doesn't understand what['s]
　　　leading—that's not—
　　　MS. LEFEBER: Objection.
　　　MR. MCGETTIGAN: —a leading question.
　　　MS. LEFEBER: You know, these kind of remarks in front of the jury
　　　are inappropriate.
　　　THE COURT: That was a little more leading, Mr. McGettigan, than
is necessary.

Docket No. 79 at 163-64.

[20] The exchange proceed as follows:

　　　[BY MS. LEFEBER]: Q. Now did you tell us yesterday that you
　　　never went into the Midway Diner on November the 10th?
　　　A. I wasn't sure.
　　　Q. You weren't sure?
　　　A [MCKINLEY]: I wasn't—two years ago—I wasn't sure of every
　　　movement. I don't know if I briefly stopped in there or if I stayed
　　　outside. But, I'm most likely positive I was outside the whole time.
　　　Q. Okay. So, you're most likely positive that you were outside the
　　　whole time. So that, if Sgt. Farley testified that you went inside, he
　　　would be mistaken?
　　　A. Probably so. It was two years ago to him too. He's probably not
　　　sure of every movement too.

　　　　　　　　　　　　　　　　　　　　　　　　(continued...)

-29-

The defense's examination of Corporal McEvoy prompted another heated exchange between the prosecutor and Ford's counsel.  Corroborating McKinley's testimony that he exchanged drugs and money with Ford through a handshake, Corporal McEvoy testified on direct examination that he saw Ford and McKinley shake hands outside the Midway Diner on November 10.  On cross-examination, Ford's counsel called the truthfulness of this testimony into question by highlighting that Corporal McEvoy's contemporaneous notes did not document this handshake or other observations to which he testified.  Docket No. 80 at 124.  On re-direct examination, the prosecutor asked

_____

[20](...continued)
> Q. Oh, okay. Now you say after you met Harold Ford either inside our outside of the Midway Diner on November the 10th,—
> MR. MCGETTIGAN: Excuse me.
> BY MS. LEFEBER: Q. —that he—
> MR. MCGETTIGAN: Objection. That misstates his testimony. He never said he met Mr. Ford inside the Midway Diner—
> BY MS LEFEBER: Q. Well,—
> MR. MCGETTIGAN: —ever
> BY MS LEFEBER: Q. —you met him, right, either inside or outside. You can't remember, right?
> MR. MCGETTIGAN: Excuse me. Objection. That misstates his testimony as well. He doesn't say can't [sic] remember where he met Mr. Ford. And, counsel is intentionally misstating the testimony.
> MS LEFEBER: Your Honor, that's rude.
> THE COURT: Mr. McGettigan, I think—I think it's unnecessary to characterize counsel as having intentionally done anything.
> MR. MCGETTIGAN: I beg your pardon, Your Honor.
> THE COURT: If you have an objection to make, you can make the objection. But, the editorializing is unnecessary.

Docket No. 80 at 30-32.

McEvoy whether he would "testify to anything falsely or that [he] did not recollect . . . to convict Harold Ford or anybody else," to which Corporal McEvoy responded: "Absolutely not."  Docket No. 80 at 133.  Ford's counsel conducted re-cross examination about this statement, and elicited testimony that Corporal McEvoy failed to inform the government that he was named, with other officers, as a defendant in a lawsuit alleging arrests based on an unlawful search:[21]

> BY MS. LEFEBER: Q. When – in preparation for your testimony here today, did you meet with Mr. McGettigan?
> [CPL. MCEVOY:] A. Yes, ma'am.
> Q. And, did he ask you whether or not there are any pending actions against you for false arrests?
> A. Yes, ma'am.
> Q. And, did you tell him absolutely not?
> A. Yes, ma'am.
> Q. And, that isn't true, is it, sir?
> A. No, ma'am.

---

[21] *See Pitner v. Murrin*, Civil No. 07-355 (E.D. Pa. filed January 29, 2007).  In *Pitner*, the plaintiffs alleged that Corporal McEvoy and other officers engaged in a search that was undertaken pursuant to a warrant, but which was nonetheless unlawful.  *Pitner v. Murrin*, Civil No. 07-355 (E.D. Pa. filed January 29, 2007).  Specifically, plaintiffs alleged that, to obtain the search warrant, the officers filed an affidavit stating that one of the plaintiffs, driving a Ford Bronco, picked up a street-level drug dealer, who had informed an undercover agent that he was waiting to get marijuana from his supplier, and that the street-level dealer soon returned with marijuana on hand.  *See id.*, Second Am. Compl. ¶ 18.  Plaintiffs further alleged that, prior to executing their search, the officers had "no information that plaintiffs were involved in any criminal activity."  *Id.* ¶ 36. After Ford's trial, the court awarded summary judgment to defendants and, in so doing, found that Corporal McEvoy did not swear to the facts alleged in the affidavit, and did not participate in drafting the affidavit.  *See Pitner*, Civil No. 07-355, 2008 WL 2552807, at *1 (E.D. Pa. June 25, 2008).

Q. There is a pending law suit in this district court house against you for participating in fabricating false arrests, correct?

A. Ma'am, I believe your facts are far from true.

Q. Well, let's put it this way. There is a pending action against you in your capacity as a Coatesville Police Officer in this United States District Courthouse, is that correct?

A. As a member of the Chester County Municipal Drug Task Force, I was one of numerous officers named in a law suit stemming from a search warrant . . . which had nothing to do with my testimony, . . . false or true.

Docket No. 80 at 133-34.  In further re-direct examination, the prosecutor attempted to

diminish the significance of Corporal McEvoy's omission in the following exchange:

BY MR. MCGETTIGAN: Q. Did I ever ask you if you were involved in a law suit?

[CPL. MCEVOY:] A. Yes, sir.

Q. Did you tell me?

A. I told you that I didn't – I wasn't aware of anything that was pending against me.

Q. Does this suit have anything to do –

MS. LEFEBER: Objection, Your Honor. There's nothing about what this law suit –

THE COURT: Let's not – do you have a question, Mr. McGettigan?

BY MR. MCGETTIGAN: Q. Somebody you locked you up sued you, isn't that correct?

A. Exactly.

Q. Okay. Does that happen sometimes in your line of work?

A. Yes, it does.

Q. And – oh, it was a drug offense they got locked up for too?

A. Yes, sir.

Q. Thank you very much. Just like this one?

A. Yes, sir.

THE COURT: Mr. McGettigan, that wasn't a useful remark.

MR. MCGETTIGAN: I get [sic] your pardon.

-32-

Docket No. 80 at 135-36.  Tension between counsel was quite high at this point, as evidenced by the prosecutor accusing Ford's counsel, at sidebar, of "lying" in claiming that Corporal McEvoy was alleged to have "participated in the writing of false affidavits in support of the arrests."[22]  Docket No. 80 at 136-37.

### 2.

The parties' closing arguments were no less heated.  The prosecutor was the first to summarize his case, and he began by recounting a fictional dialogue with an unnamed "colleague" in the prosecutor's office.  In that fictional dialogue, the prosecutor would express his concerns about perceived weaknesses in the government's case, and the colleague would undertake to reassure the prosecutor.[23]

---

[22] While it may be the case that the cross-examination of Corporal McElroy should have been curtailed given the minimal probative value of the inquiry, Ford's counsel was not, in fact, "lying."  In their second amended complaint, in *Pitner v. Murrin*, described in footnote 21, *supra*, plaintiffs alleged that, although McEvoy did not sign the affidavit used to obtain the search warrant, he was one of the affiants.  Second Amended Complaint ¶ 16, *Pitner*, No. 07-355.

[23] The prosecutor presented this fictional dialogue as follows:

> And I'll tell you, in thinking about a case, even relatively brief cases, sometimes lawyers will discuss with their colleagues, and I think, what's the expression, you look for a devil's advocate, and you talk about your case a little bit.
>
> And, now, you can do that in this case.  One of the things you can say is gee, you know, I would have liked to have had an officer who was placing recorders and transmitters, who was really familiar

(continued...)

[23](...continued)

with Coatesville, who wasn't a University of Pennsylvania officer. And then my colleague would say, well, isn't Coatesville a small town with maybe just one or two police officers devoted to narcotics? So you'd have to have a task force, you have to have others. Okay. Fine.

But then I said, well, gee, I'd really like to have a witness buy a half an ounce and an ounce of drugs, who didn't have a lengthy criminal history involving drugs and contact with criminals and stuff like that.

And my colleague would say, well, gee, a nun, a priest, a person with no criminal history might have a tough time buying an ounce or two, or an ounce, or a half ounce of crack cocaine in Coatesville.

So I had to admit, there is some sense in that. So then you say, geez, you think I could have recorded tapes that didn't have a lot of background noise, and that you can hear audibly and just more of them. And my colleague would say, well, it's probably not reasonable to shut down traffic on Main Street in Coatesville and putting [sic] a big, visible microphone on your cooperator. It really might not be conducive to being able to buy drugs.

So I said, well, gee, you know, I'd really like to have an agent who could drive to an unfamiliar place, use a two-way radio, follow people while they're walking, not be seen and take notes, all at the same time.

And my colleague said, well when they get an agent with three arms, you'll probably get that. I said, hum, I'd like someone to be real close to these transactions.

They said, that's pretty hard to do in an urban area where the police might be known.

And, finally, I said, gee, you know, can I have a police officer who hasn't been sued? And my colleague said, well, weren't you, the defense attorney and the Judge in your last drug case all sued? And I had to admit, he had a point. You can sue anyone you want.

Docket No. 81 (Transcript of Trial, January 28, 2008) at 10-12. Then, while addressing the reliability of Kevin McKinley's testimony, the prosecutor continued:

(continued...)

-34-

Then, after addressing the credibility of the government's witnesses, the prosecutor

recited what he characterized "principles that apply to criminal cases generally." Docket

No. 81 at 15.  The prosecutor asserted that, under these general "principles," the defense's

argument that Ford was not the person who distributed drugs to McKinley on November

10 was a "defense of . . . last resort."[24]  Docket No. 81 at 16.

---

[23](...continued)
  And that's one other thing I asked my colleague.  I said, you know, you'd think I could have a witness who would speak up, who would really stand – get next to that microphone and talk to the Court.  And my colleague said, well, those are the actors, not real people.

Docket No. 81 at 14.

[24] The prosecutor said, in full:

  So, I'm going to give you a little background, just in the way to look at this case. With the principles that apply to criminal cases generally.  It's kind of an interesting thing. Something that was pointed to me years ago.  The arguments against the non-occurrence of a criminal act are limited to three.
  Three things. (a) It didn't happen.  That's number one – well, one.  It didn't happen.  There was no crime.  No crime, in fact, occurred.
  Okay?  For instance, the person you thought was dead, they turn up.  The money you thought was stolen was just misplaced.  So no crime occurred.  The act itself didn't occur.  Okay.  Two, the act occurred, but there's an excuse, or a justification.  Well I didn't hit first, it was self-defense.  Or for instance, I'll tell you what, but for my role here today in this courtroom, this [— the prosecutor took the package of cocaine base that was marked as a government exhibit and placed the package under his suit jacket —] would be a criminal offense.
  But I have an excuse. This is my job.  So, that's two of the explanations of why a crime hasn't occurred.  Well, and then there's the third.  And that's

                (continued...)

In her closing argument, Ford's counsel challenged the prosecutor's characterization of Ford's defense as one of "last resort." Docket No. 81 at 30-31. Ford's counsel then suggested that the government was trying to "keep the truth from" the jury by having refused, in the course of the trial, to stipulate to the fact that no drugs were found on Ford during his arrest,[25] and by objecting to Ford's request to play the tape of

―――――――――――――

(...continued)

how we arrive here. The third is, well it happened, the crime happened. There's no excuse, no justification. But it wasn't me.

So what you'll hear – what you understand here is a defense of – an argument, excuse me, of last resort, well because – and I think counsel, and correct me if I'm wrong, it's your recollection that controls, counsel, in her opening said, well, there were drugs purchased that day, no question about that.

And as far as I know, there's no excuse or justification present. These aren't prescription drugs.

So, by a last resort, we arrive at, it wasn't me.

Docket No. 81 at 15-16.

[25] Ford's counsel said, in full:

The truth in this case is that this Government wants to keep the truth from you. They wanted to keep the truth from you. They don't want you to know the real facts and the real truth. Do you remember when Corporal McEvoy was on the stand? The first question out of the box I asked him was, you arrested Mr. Ford, didn't you?

Yeah. Did he have any drugs on him? Did he have any drug paraphernalia? Did he have large sums of money? Did he have anything on him at all?

I don't remember. And before I asked McEvoy that, I asked the Government for a stipulation, can you stipulate that when you arrested my

(continued...)

McKinley negotiating a drug transaction outside the Midway Diner during the period

when he was, according to his testimony, waiting for Ford to return with the drugs.[26]

_____

(...continued)

client, nothing on him but $37?  Oh, no, we can't, we can't agree to that.  So I ask the witnesses.  Okay?  McEvoy, at first he didn't recall, but then I think he did.  And, of course, it's your recollection. And the truth is, the truth came out through Agent Wood.

Thirty-seven dollars on him when they arrested him.  No drugs.  No drugs found in his home.  No guns, no scales, nothing.  Why didn't the Government want you to know that?  Why did they try so hard to keep that from you?

Docket No. 81 at 31-32.

[26] Ford's counsel argued (with some inaccuracy as to McKinley's testimony about whether he went inside the Midway Diner):

I have to get up on cross-examination and ask them to play the tapes of Kevin McKinley's drug dealing, minutes before he meets Harold Ford at the Midway, with Martinez. And if you recall the Government, oh, we don't have those tapes, we can't play those. Oh, and we didn't bring them along.

They brought them, and we eventually got them to play them for you. Remember that call at, I believe it was 11:49am on November the 10th, to Martinez? You heard it loud and clear. Half ounce of crack cocaine. Kevin McKinley wanted to get [crack] from Mr. Martinez, who I think there's testimony that they arrested him at some point, but they didn't see him that day.

Half an ounce, loud and clear.  In 40 minutes.  It was 11:49 on November the 10th.  Forty minutes later, Officer Farley told you, is just about when Kevin McKinley gets to the Midway.

And goes inside the Midway. Officer Farley – Sergeant Farley told you he went into the Midway.  There's no officers in the Midway.  The Government didn't play that tape for you, I had to play that tape for you.

How about the next conversation?  Minutes later, minutes before this

(continued...)

Docket No. 81 at 31-24.  Elaborating on this point, Ford's counsel emphasized that the

task force officers' contemporaneous notes did not corroborate McKinley's and

McEvoy's testimony, and that other supporting evidence, such as telephone records

corroborating McKinley's claim that he called Ford on November 10, "just isn't here:"

> They didn't arrest him for a year later, is the excuse. I suggest to you,
> ladies and gentlemen, they didn't arrest him for a year later, because they
> didn't believe their own case.

Docket No. 81 at 37.

Ford's counsel also aggressively questioned the truthfulness of both McKinley's

and Corporal McEvoy's testimony.  Ford's counsel characterized Corporal McEvoy as

having "made a deal with the devil" in choosing to work with McKinley, Docket No. 81

at 34, and described McKinley's as "a man that his entire adult life has engaged in drug

dealing, carrying loaded weapons to enforce – to get whatever he wanted to get.

Recklessly endangering other people with guns.  Shooting at people, stalking them,

---

(...continued)

> supposed deal went down between Kevin McKinley and Harold Ford, another
> conversation, there's some unknown drug dealer.  Well, you can't arrest an
> unknown can you?
>
>    . . .
>
> In those conversations, see, people, McKinley and the unknown and
> Martinez, they actually engaged in drug transactions.  They discussed them.
> You heard them on the tapes.  The Government didn't play that for you, they
> want to keep the truth from you, ladies and gentlemen.

Docket No 81 at 32-34.

harassing them, assaulting them.  Doing whatever he could to get his way."  Docket No.

81 at 47-48.  McKinley testified against Ford, defense counsel argued, because "he

realized that the jig [was] up" when he was arrested in October 2005.  Docket No. 81 at

48.  Ford's counsel further argued that "what the Government proved here beyond a

reasonable doubt, is that Kevin McKinley should be sitting over there charged with the

crimes that he committed, and he should be the one facing 30 years to life."  Docket No.

81 at 49-50.  Then, Ford's counsel urged the jury to ask whether Corporal McEvoy

"appear[ed] to . . . have his own agenda in this case," Docket No. 81 at 50, and pointed to

aspects of Corporal McEvoy's testimony that, she argued, could support this conclusion.[27]

---

[27] Specifically, Ford's counsel said:

Do you recall how he recalled, with the greatest of precision imaginable, that on that day we left an undisclosed location and we turned southbound on 7th Street and northbound on Merchant and eastbound on Lincoln, and so and so, and at such a time I parked at the so and so and got – McKinley and Ford were five to seven feet, this far apart, and I was located a block and a half away.

A block being at least the size of this courtroom.  And I saw this and I saw that.  And I witnessed a handshake.  And he remembered all of that with the greatest precision, he was very impressive at that time.  Until cross-examination.  And the first question out of the box was, do you recall when Mr. Ford was arrested?  Did he have any drugs on him?

Oh, I don't recall.  You don't recall?  What do you have, selective memory?  You recall somebody walking eastbound on Merchant, or westbound on Lincoln Highway, and you don't recall whether the person who is the target of this whole thing who we're trying to prosecute here, you don't recall when you arrested him whether he had drugs on him?  Come on.

Do you have your own agenda?  Maybe he's getting points for

(continued...)

After doing so, Ford's counsel highlighted the prosecutor's question to Corporal McEvoy,

on redirect examination, as to whether he would ever lie on the witness stand to convict

Harold Ford:

> And it was I who had to remind him, oh, no you wouldn't?  You lied to
> Mr. McGettigan when he asked you whether there were any pending cases
> against you in your capacity as a police officer in Coatesville, for making false
> affidavits against people to get them arrested.  You lied to your own lawyer
> when he asked you that.
>
> And, of course, it's your recollection that counts.  But I recall him
> saying, yeah.  I didn't tell him about that.  And this is not about that lawsuit,
> whether or not he lied to get other people arrested.
>
> It's not about that.  It's about his character for truthfulness and whether
> or not he would lie to get Harold Ford convicted.  And I submit to you, if he
> lied to his own lawyer, Mr. McGettigan, about a prior lawsuit that we learned
> are – is actually pending in this courthouse, if he lied to his own – the lawyer
> for the Government about that, he's lying to convict Harold Ford."

Docket No. 81 at 53-54.

---

(...continued)

> convicting people, because after all remember he told you, I was trying to
> show that he's a busy officer.  Remember?  Did you work five days a week?
> Oh, no I worked six days a week.  Okay.
>
> And I think he was one of two narcotics officers in Coatesville. So he
> must have been very busy, I would assume.
>
> And this did happen two years ago.  So when he realized where I was
> going, all of a sudden he told me he didn't witness it.  Some weeks he didn't
> even witness a crime.  Can you believe – could you believe that? Do you really
> believe that, that he didn't witness any crimes?

Docket No. 81 at 50-51.

**3.**

Against this background, the prosecutor began his rebuttal, which were the final

remarks that the jury heard from either party, as follows:

> Thank you your Honor. Ladies and gentlemen, when counsel referred
> to the Government and the Government's lawyer, she was pointing at me. She
> should have been talking about Officer – Corporal McEvoy back there, too.
> Now, I'm the Government lawyer. I'm not getting rich. If a trial goes a week,
> I got to wear the same suit twice.

Docket No. 81 at 57.  The prosecutor continued:

> But when counsel says, the Government wants to keep the truth from
> you, well, as a lawyer, you don't have a whole lot, sometimes, but your good
> name and when you're accused personally –.

Docket No. 81 at 57-58.  Ford's counsel objected to this comment.

Calling the parties to sidebar, I instructed the parties as follows:

> THE COURT: Ms. Lefeber, your argument is one that challenges the
> Government's readiness to present the truth, and so Mr. McGettigan is
> entitled to respond.  The response, I think, should not be extensively personal,
> Mr. McGettigan. . . . [I]t's not a personal statement. It's a statement about the
> Government and what the Government's responses and attitudes and
> responsibilities are.  So, let's, from now on, have no more.

Docket No. 81 at 58.

The prosecutor's argument continued.  After suggesting that the jury should reject

the "argument that the Government didn't want you to know the truth," the prosecutor,

approaching the jury box, said:

> You know, phone records, that would have been a good idea.  It wasn't my idea. But to say that the Government's counsel, the Government sought to conceal the truth from you, I submit goes beyond the pale. As does accusing an honorable, I would submit—

Docket No. 81 at 59.

By this point, the prosecutor was fully facing the jury box and speaking at a

volume too quiet to be heard by me or by the court reporter, and the transcript reflects this

gap.  At my request, the prosecutor continued at a louder volume:

> You saw Officer McEvoy on the witness stand, Corporal McEvoy. And I'm sure you saw much of his – much of his head that's visible get a little bit red as he was accused of things. Probably did, again.
> And you saw him . . . accused here. As if he were being paid piecework. And I'd submit to you that he was an honorable police officer doing honorable work. And, instead, for his trouble, you saw him accused of being a liar, as if he would lie to convict Harold Ford. As if the Government's counsel would mislead you to convict Harold Ford.

Docket No. 81 at 59-60.  Ford's counsel again objected, and I cautioned the prosecutor

that "we're not going to be pursuing personal lines."  Docket No. 81 at 60.  The

prosecutor then, after explaining that "you're going to get called names" in his line of

profession, offered the following anecdote:

> I'm reminded by counsel's argument of something that occurred to me, not that long ago.  I ran into a defense attorney who I knew and was friends with, from years gone by, and he was about to close to a jury early in the day.  I said, hey, Brian, can I buy you lunch?  He said, don't wait, it might take me a while to confuse the issue.  And that's why I said what I had to say before counsel got up.

Docket No. 81 at 60.

Then, after addressing the credibility of Kevin's McKinley's testimony, the

prosecutor commented on the defendant's failure to testify at trial:

> In addition, counsel, at one point, I think she said and I made a few notes here, that the defendant said, well, Mr. Ford doesn't have to say anything, and he didn't say anything. He hasn't said a word in this courtroom. So I don't know what she was referring to.

Docket No. 81 at 62.

The prosecutor went on to address Ford's counsel's suggestion that the

government did not believe its own case and, in doing so, characterized the defendant's

closing argument as "a lot of lawyer noises being made there."[28]  Docket No. 81 at 64.

Then, responding to the defense's characterization of McKinley's criminal history, the

prosecutor revisited McKinley's statement that he had been shot, which I had previously

---

[28] The prosecutor said:

> I'd submit that you can infer that Mr. Ford was not locked up for a year, because it was an ongoing investigation.
>
> Kevin McKinley cooperated and made other buys.  And if you lock someone up on the first day, the person who's the cooperator is useless for the rest of your activities.  Instead, and I tried to follow this argument a little bit. And there were a lot of lawyer noises being made there, and I couldn't follow them all.  And one of them said, why wasn't he locked up for a year?  Because we didn't believe him.  And I've been in this business for awhile.
>
> I want to hear that conversation, boss, we've been letting this sit out there for a year, we don't believe the guy, let's lock somebody up.

Docket No. 81 at 64.

instructed the jury to ignore:

> Counsel, I believe said, at least once or more than once, that Kevin shot
> somebody, he was shooting somebody to get whatever he wanted. As I recall,
> he got shot, not that he shot someone.

Docket No. 81 at 65.  Ford's counsel objected to this statement, which I overruled by

saying "I think the jury will remember and decide what was said.  It's up to the jury."

Docket No. 81 at 65.

> The prosecutor then continued his closing argument with this remark:

> At this moment, I'm reminded of a discussion I had outside of a
> courtroom one time, where I was trying to persuade a number of people, and
> I was interrupted by my opponent, my adversary in the argument. And
> eventually, after his second or third time, he said, hey, shut up, Joe you're
> making sense.

Docket No. 81 at 65-66.  I then issued another cautionary instruction, and the rest of the

prosecutor's rebuttal continued without interruption.

**C.**

Ford contends that, in his rebuttal, the prosecutor committed misconduct by

vouching for the credibility of the government witnesses and disparaging Ford's counsel.

As the Supreme Court has observed in *United States v. Young*:

> The prosecutor's vouching for the credibility of witnesses and expressing his
> personal opinion concerning the guilt of the accused pose two dangers: such
> comments can convey the impression that evidence not presented to the jury,
> but known to the prosecutor, supports the charges against the defendant and
> can thus jeopardize the defendant's right to be tried solely on the basis of the

-44-

evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

470 U.S. at 18-19.  According to the Third Circuit, in order to establish that a prosecutor's remarks constitute improper vouching, "two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record.'"  *Kindler v. Horn*, 542 F.3d 70, 87 (3d Cir. 2008) (quoting *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)).  "The defendant must be able to identify as the basis for [the prosecutor's comment on witness credibility] explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record."  *United States v. Brennan*, 326 F.3d 176, 183 (3d Cir. 2003) (alterations in original) (quoting *Walker*, 155 F.3d at 187).

Linked to these vouching claims is Ford's contention that the prosecutor impugned the truthfulness of Ford's counsel based on information outside the record.  *See United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007) ("[T]he prohibition against personal attacks on attorneys is rooted less in a sense of decorum than in the same rule underlying the prohibition on vouching: one cannot make arguments unsupported by the record evidence.").  The statements that ground this misconduct claim are interwoven with the remarks that, according to Ford, constituted personal assurances by the prosecutor as to

the credibility of the government's witnesses.  Therefore, in order to avoid drawing an

artificial distinction between the contexts in which the remarks arose, I will analyze

Ford's misconduct claims based on the prosecutor's disparagement of counsel together

with his vouching claims.  *See, e.g., Young*, 470 U.S. at 11 ("[A] criminal conviction is

not to be lightly overturned on the basis of a prosecutor's comments standing alone, for

the statements or conduct must be viewed in context; only by doing so can it be

determined whether the prosecutor's conduct affected the fairness of the trial.").

> ### 1.

The prosecutor's rebuttal was focused on bolstering the credibility of McKinley's

and Corporal McEvoy's testimony.  This focus was appropriate, as Ford's counsel called

the truthfulness of those witnesses' testimony into question.  However, in expressing his

anger that Ford's counsel challenged the integrity of the government's case, the

prosecutor remarks went beyond appealing to the evidence in the record and invoked the

prestige of the government's office.

First, the prosecutor accused  Ford's counsel of going "beyond the pale" in

suggesting that the government was concealing the truth from the jury by failing to

provide telephone records corroborating McKinley's testimony and by "accusing an

honorable" officer of testifying untruthfully.  Continuing with this argument, the

prosecutor undertook to assure the jury that Corporal McEvoy was an "honorable police

officer" and equated the integrity of the challenged law-enforcement-officer witness with the integrity of "Government counsel"–i.e., the prosecutor himself:

> I'd submit to you that [McEvoy] was an honorable police officer doing honorable work. And, instead, for his trouble, you saw him accused of being a liar, as if he would lie to convict Harold Ford. As if the Government's counsel would mislead you to convict Harold Ford.

Docket No. 81 at 60.

The government contends that the prosecutor did not, at any point during the course in these remarks, offer a personal opinion as to the credibility of the witnesses. However, a prosecutor's assurance of a witness's credibility is impermissible if it is based on either an "explicit or implicit reference to . . . the personal knowledge of the prosecuting attorney." *See Brennan*, 326 F.3d at 183. The Third Circuit has held that prosecutorial remarks that may be construed as invoking the integrity of the government may be appropriate if, when the remarks are considered in context, it is clear that the prosecutor was making a specific argument, based on the trial record, about the government's veracity. For example, in *Brennan*, the court considered a closing argument that the prosecutor initiated by saying that "'one hallmark of our system is that we don't make accusations without proof.'" *Id.* at 185. The court acknowledged that, read in isolation, this remark "could be read to suggest that evidence outside the record demonstrated [the defendant's] guilt." *Id.* However, the court observed that "immediately

following his assertion that the Government does not make accusations without proof, the prosecutor directed the jury to consider the corroborating evidence and [a witness's] demeanor during his five days of testimony." *Id.* at 186.  Therefore, the *Brennan* court determined, the statement at issue, taken in context, was a legitimate attack on the defendant's case.  Similarly, in *United States v. Walker*, 155 F.3d 180, (3d Cir. 1998), the court held that it was permissible to ask the jury what motivation a testifying officer had to lie in order to draw attention to the lack of evidence supporting the defendant's challenge to the officer's truthfulness.  *Id.* at 186.

In this case, by contrast, several of the prosecutor's objected-to remarks during rebuttal — particularly his statement that it was "beyond the pale" for Ford's counsel to challenge the truthfulness of the government's case" and his expression of offense ("[a]s if the Government's counsel would mislead you to convict Harold Ford") — were not tethered to the record.  When viewed in context  — a context that includes other, milder forms of vouching,[29] as well as the prosecutor's attacks on Ford's counsel and his

---

[29] These milder instances of vouching include the prosecutor's improper claim of authority — "I've been in this business for awhile" — that preceded an otherwise appropriate argument that the government would have little incentive to lock up Kevin McKinley.  Docket No. 81 at 64-65.  The prosecutor's vouching during rebuttal was also echoed in his appeal to facts outside the record in his initial closing argument when attempting to belittle the significance of Corporal McEvoy having been sued in connection with another investigation: "And my colleague said, well, weren't you, the defense attorney and the Judge in your last drug case all sued?"  Docket No. 81 at 12.

characterization of the defense's closing argument as an insult to his "good name"[30] —

the prosecutor's remarks were, quite plainly, decoupled from the record.  Nor is there

reason to regard the remarks as simply being regrettable but excusably inartful turns of

phrase.  They were remarks with the clear potential of artificially magnifying the

government's credibility in the eyes of the jury, whether or not they were so intended.

Thus, with these statements, the prosecutor went beyond asking the jury what motivation

Corporal McEvoy had to lie, or what motivation the government had to withhold the

truth, and managed to invoke the government's prestige in bolstering its witnesses'

credibility.[31]

---

[30]  These remarks are particularly salient, as they immediately preceded the
remarks in question and made clear that the prosecutor was invoking the government's
"good name" as such, rather than offering a reasonable inference from the record about
the government's integrity in this case.  *See* Docket No. 81 at 57-58 ("Now, I'm the
Government lawyer. I'm not getting rich. If a trial goes a week, I got to wear the same
suit twice. . . . But when counsel says, the Government wants to keep the truth from you,
well, as a lawyer, you don't have a whole lot, sometimes, but your good name and when
you're accused personally-[.]").

[31]  In addressing Ford's claim that these statements constitute vouching, the
government focuses on the prosecutor's statement that Corporal McEvoy was "an
honorable police officer doing honorable work."  I agree that this statement, if it had
stood alone, would have been an appropriate response to the defense's allegation that
Corporal McEvoy had falsely testified to witnessing a handshake between Ford and
Corporal McEvoy.  *See United States v. Weatherly*, 525 F.3d 265, 271-72 (3d Cir. 2008)
(holding that, where the defense counsel accused testifying officers of perjury, the
prosecutor could ask "[w]hy would [the officers] risk their 32-34 years of experience on
the police force over this case" where the question "called for an inference based upon
(continued...)

The prosecutor's remarks, taken in context, thus closely resemble those that the court found improper in *United States v. Dispoz-O-Plastics, Inc*., 172 F.3d 275, 283 (3d Cir. 1999), where the prosecutor bolstered the credibility of a cooperating witness by assuring the jury that the government does not "give two for one deals."  They also evoke the remarks that the court found impermissible in *United States v. Molina-Guevara*, 96 F.3d 698, 704-05 (3d Cir. 1996), where the prosecutor told the jury "that it was 'insulting' and 'ridiculous' to think that the United States would put on a witness who would lie." *See also United States v. DiLoreto*, 888 F.2d 996, 998-99 (3d Cir. 1989) (holding that vouching occurred where the prosecutor asserted that "[w]e [the government] don't take liars.  We don't put liars on the stand. We don't do that"), *overruled on other grounds by Zehrbach*, 47 F.3d 1252 (holding that prosecutorial misconduct is not reversible *per se* and must be reviewed for harmless error).  Here, as in those cases, the prosecutor did not defend the witnesses' credibility based on inferences that could be drawn from the evidence.  Instead, the prosecutor relied on the prestige of his office to counter the suspicions that Ford's counsel attempted to convey to the jury through arguments that,

---

(...continued)

evidence in the record").  But, in the case at bar, the prosecutor's gratuitous comments appear to accord McEvoy's testimony the imprimatur of government endorsement.

while aggressive, were grounded in the record.[32]  This is misconduct.

> **2.**

Also problematic were the prosecutor's remarks disparaging not just Ford's counsel, but the criminal defense bar more generally.  In response to objections by Ford's counsel to the prosecutor's rebuttal, the prosecutor offered the two anecdotes described

---

[32] The government does not appear to argue that the government's remarks were justified by the "invited response doctrine."  However, even if the government's brief could be construed to make this claim, I would not find the prosecutor's remarks so justified.  Ford's challenge to the truthfulness of the government's witnesses and the forthrightness of the government's case was rooted in (1) the testimony of the government witnesses, (2) the existence of potentially exculpatory recordings of Kevin McKinley's conversations on November 10, and (3) the government's resistance to having those recordings played for the jury.  The defense's argument was thus grounded in the evidence and was not articulated in markedly personal terms.  *See United States v. Weatherly*, 525 F.3d 265, 272 (3d Cir. 2008) ("It is permissible for counsel to argue inferences, but an inference must flow logically and convincingly from the facts in the record."); *see also Dipoz-O-Plastics*, 172 F.3d at 285 ("We have generally found the invited response doctrine to be applicable only in instances where the prosecution team was attacked for reasons unsupported by the evidence at trial.").

As I instructed at the beginning of the government's rebuttal, the government was certainly entitled to address the defense's challenge to its candor, but it was not permitted to cast that argument in "excessively personal terms."  Reviewing the prosecutor's remarks in light of the trial record and based on my observations of the case, I find that the prosecutor's vouching was far in excess of any attack that was justified by the conduct of Ford's counsel.  *See United States v. Wood*, 486 F.3d 781, 788 (3d Cir. 2007) ("The invited response doctrine  protects comments made in reasonable response to improper attacks by defense counsel. . . . But though a prosecutor may use the doctrine defensively, he may not do so offensively.") (internal quotation marks omitted).  I further note that the defense's closing argument, while aggressive in its attacks on the government, was a not-unwarranted response to the prosecutor's closing-argument characterizing the defense's trial strategy as one "of last resort."

above, relating tales about how defense attorneys generally try to "confuse the issue[s]" and prevent government attorneys from "making sense." *See supra* section IIB3 (explaining the content of the prosecutor's rebuttal).

These comments were manifestly inappropriate.  The anecdotes served no purpose other than to encourage a juror to reject the defendant's arguments based on its skepticism of the criminal defense system, rather than on the strength of the government's evidence. They bore no relationship to the evidence at bar, and they were incompatible with the constraints that guide a prosecutor.  *See* ABA Standards for Criminal Justice (3d ed. 1993) §§ 3-5.8(c) ("The prosecutor should not make arguments calculated to appeal to the prejudices of the jury."), 3-5.8(d) ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.").

The government argues that these remarks were "direct comments on defense tactics," specifically Ford's counsel having interrupted the prosecutor's rebuttal with objections, and therefore "they were not improper."  Docket No. 89 at 28-29.  This is incorrect for three reasons:

First, Ford's counsel's objections to the prosecutor's rebuttal were appropriate responses to the prosecutor's remarks and, indeed, necessary to preserve Ford's misconduct claims for review.

Second, while the prosecutor may be permitted to comment on specific,

inappropriate defense arguments for the purpose of tempering any clearly unwarranted

juror suspicions of the government's case that such arguments may give rise to, the

prosecutor is not permitted to do so in a way that is itself calculated to inflame the jury's

prejudices. *See, e.g.*, *Dispoz-O-Plastics, Inc.*, 172 F.3d at 284-85 (holding that the invited

response doctrine may not be used as a "springboard" to

"launch[ ] affirmative attacks upon defendants").  Thus, regardless of whether the

prosecutor's observations were uttered in response to what the prosecutor perceived to be

an inappropriate defense tactic, the prosecutor engaged in misconduct.

Third, the prosecutor's anecdotes do not appear to have been addressed to a

specific defense tactic.  The prosecutor cast his insults in general terms, and did not

comment upon specific behavior by Ford's counsel that he deemed inappropriate.  More

tellingly, the prosecutor's inappropriate remarks were not isolated responses to perceived

defense challenges.  Later in his rebuttal, the prosecutor characterized the defense's

closing arguments as "a lot of lawyer noises being made there."  Furthermore, the

prosecutor's attacks during rebuttal echoed inappropriate and inflammatory accusations

that he earlier made in open court, such as the charge, made during Ford's counsel's

opening statement, that she was "making something up."[33]  Those earlier accusations

---

[33]The government argues that it was justified in accusing Ford's counsel of
"making something up," Docket No. 79 at 32, because she characterized McKinley as

(continued...)

antedated Ford's counsel's closing argument, which belies the government's argument

that the prosecutor's attacks during rebuttal were a measured response to specific defense

tactics.

I therefore find that the prosecutor's attacks on Ford's counsel and the defense bar

generally cannot be justified as "comments made in reasonable response to improper

---

[33](...continued)

having "led a lifetime of crime," including "[r]obberies, stabbings, drugs, drugs, drugs, and more drugs," and "carrying a gun, sticking up people, and terrorizing people with that gun." Docket No. 79 at 31-32. According to the government, this characterization of McKinley's criminal history "bore no basis in fact (except for the drug trafficking, which was brought out by the government in it's [sic] opening statement.)" Docket No. 89 at 29.

However, while Ford's characterization of McKinley's criminal history was hyperbolic, and thus invited some response from the prosecutor, the statements were moored in fact. As addressed above, McKinley's lengthy criminal history included, in addition to numerous other firearm charges, a 2002 charge for making terroristic threats and 2003 convictions, pursuant to a guilty plea, for reckless endangerment and carrying an illegal firearm. The 2003 convictions were based on McKinley shooting into the window of an occupied vehicle. Docket No. 80 at 62-63. While the references by Ford's counsel to "robberies, stabbings," and "sticking up people" were based on information that was ultimately excluded from evidence, the information was not "made up," but was drawn from a presentence investigation report of McKinley that defense counsel had received from the government just days before the trial.

Thus, the prosecutor's allegation was one that was "unsupported by the record evidence," *Rivas*, 493 F.3d at 139, and was an inappropriate response to Ford's opening argument. *See United States v. Pelullo*, 964 F.2d 193, 218 (3d Cir. 1992) (stating that attorneys may not accuse each other of "misconduct, such as subornation of perjury, unless there is a foundation in the record to support such charges"); *see also Dipoz-O-Plastics*, 172 F.3d at 285 ("We have generally found the invited response doctrine to be applicable only in instances where the prosecution team was attacked for reasons unsupported by the evidence at trial.").

attacks by defense counsel."

>**3.**

In addition to making personal assurances about the credibility of the government's witnesses and offering inappropriate remarks about Ford's counsel, the prosecutor attempted to bolster McKinley's credibility through evidence outside the record.   Early in McKinley's direct examination, the prosecutor elicited testimony that McKinley had been shot, but assured the court that he had "no intention of trying in any respect to impute" McKinley's shooting to Ford.  I instructed the jury to disregard this testimony.   Docket No. 79 at 143-44.  Nevertheless, in his rebuttal, the prosecutor said:

>Counsel, I believe said, at least once or more than once, that Kevin shot somebody, he was shooting somebody to get whatever he wanted. As I recall, he got shot, not that he shot someone.

Docket No. 81 at 65.

The government does not address this comment even though Ford objected to it at trial and raised it in his Rule 29 motion.  I nonetheless note that the comment not only refers to testimony the jury was specifically instructed to disregard, but also incorrectly suggests that there was no evidence supporting Ford's counsel's comment, in her opening argument, that McKinley's criminal history included "[s]hooting at people."  Docket No. 81 at 48.  In fact, McKinley testified that he pleaded guilty in 2003 to reckless endangerment for shooting into the window of an occupied vehicle, Docket No. 80 at 62-

-55-

63.

Additionally, this comment by the prosecutor in his rebuttal came at the conclusion

of a trial in which the prosecutor repeatedly focused the jury's attention on threats that

were allegedly directed toward McKinley.  First, in his opening statement, the prosecutor

advised the jurors that McKinley cooperated with the government "at some apprehension

and risk to himself," and that McKinley was testifying "at the risk of persons who would

have him not testify and who would intimidate him."  Docket No. 79 at 24-25.  Later, the

prosecutor attempted to ask Agent Wood "[w]hat would have happened to Kevin

McKinley if Harold Ford had been arres[ted]" in 2005.  Docket No. 80 at 154-55.

Unfortunately, I must conclude that the prosecutor's rebuttal effectively

undermined his prior assurance that he had "no intention of trying in any respect to

impute [the shooting] to this defendant."  I therefore conclude that the prosecutor's

reference to McKinley's shooting was made to bolster McKinley's credibility and inflame

the jury's prejudices against the defendant based on information not contained in the

record.

**D.**

Having identified instances of prosecutorial misconduct–improper vouching,

inappropriate disparaging of Ford's counsel and the defense bar generally, and

prejudicially referring to extra-record information–to which Ford raised contemporaneous

objections, I must consider whether these claims constituted harmless error.[34]  I will

undertake this review in accordance with the harmless error standard set forth in

*Zehrbach*:

> The harmless error doctrine requires that the court consider an error in light of
> the record as a whole, but the standard of review in determining whether an
> error is harmless depends on whether the error was constitutional or
> non-constitutional. In this instance, the alleged error, attacking the credibility
> of a witness with evidence not in the record, is non-constitutional. We have
> held that non-constitutional error is harmless when "it is *highly probable* that
> the error did not contribute to the judgment."  "High probability" requires that
> the court possess a "sure conviction that the error did not prejudice" the
> defendant.

47 F.3d at 1265 (citations omitted; emphasis in original).  I will treat defendant's charges

as claims of non-constitutional error for the purpose of this review.  *See, e.g.*, *United

States v. Weatherly*, 525 F.3d 265, 273 (3d Cir. 2008) (reviewing vouching claims for

non-constitutional error); *but see Molina-Guevara*, 96 F.3d 698, 705 (3d Cir. 1996)

(reviewing vouching that allegedly violated a defendant's Sixth Amendment rights for

constitutional error).  Therefore, having determined that misconduct has occurred, I must

---

[34] Ford raises other claims which, if they were to be addressed, would be subject to
plain error review.  For example, Ford contends that the prosecutor improperly shifted the
burden of proof to the defendant by categorizing Ford's arguments, under what the
prosecutor characterized as "principles that apply to criminal law generally," as a
"defense of . . . last resort."   Docket No. 81 at 15-16; *see United States v. Balter*, 91 F.3d
427, 441 (3d Cir. 1996).  ("[T]he prosecution . . . may not improperly suggest that the
defendant has the burden to produce evidence.").  Because I find that the jury's verdict
must be set aside on other grounds, I will not reach these claims.

consider whether I am left with a "sure conviction that the error did not prejudice the defendant." *Zehrbach*, 47 F.3d at 1265.

"The test for determining prejudice," under this standard, "is tripartite. The factors to be examined are the scope of the comments and their relationship to the proceeding, the extent of any curative instructions, and the strength of the evidence against the defendants." *Dispoz-O-Plastics, Inc.*, 172 F.3d at 286 (citing *Zehrbach*, 47 F.3d at 1265).

First, as to "the scope of the comments" made by the prosecutor during rebuttal and "their relationship to the proceeding," the prosecutor vouched repeatedly, including when he characterized  Ford's defense strategy as one of "last resort," Docket 81 at 15-16, and addressed the lawsuit against Corporal McEvoy, by saying that his fictional "colleague said,  well, weren't you, the defense attorney and the Judge in your last drug case all sued?"  Docket No. 81 at 12.  The prosecutor's attacks on Ford's counsel and his comments alluding to McKinley's shooting and to Corporal McEvoy were plainly intended to bolster McKinley's and McEvoy's testimony.  As McKinley was the government's only eyewitness to Ford's distribution of cocaine base on November 10, and the record contained recordings that are not clearly in harmony with McKinley's testimony, any information that would bolster McKinley's credibility—including McEvoy's testimony that he observed a handshake between Ford and McKinley—could have been pivotal in persuading a jury of Ford's guilt. *Cf. Wert*s *v. Vaughn*, 228 F.3d

-58-

178, 200 (3d Cir. 2000) (finding that prosecutor's comments were harmless where they were not based on information not presented to the jury and where the record contained "ample evidence" of the defendant's guilt).  Moreover, the comments at issue occurred during the government's rebuttal, which was the final statement to the jury by either attorney, and could therefore have carried undue weight with the jury as they began their deliberations.

Second, I did not issue any specific, curative instructions to address the prosecutor's remarks.  I informally conveyed displeasure with some of the prosecutor's attacks on Ford's counsel, and issued a general instruction, in the jury charge, that "[w]hat the attorneys have said . . . is not evidence."  *But see Dispoz-O-Plastics*, 172 F.3d at 287 (finding that a general instruction to evaluate witnesses' credibility based on their testimony was not sufficient to neutralize the harm caused by a specific instance of prosecutorial vouching).  Moreover, it is quite possible that one of my instructions may inadvertently have exacerbated the effect of the prosecutor's misconduct: after the prosecutor reminded the jury that McKinley "got shot,"  I allowed the prosecutor to continue his rebuttal over the defendant's objection and said that "I think the jury will remember and decide what was said.  It's up to the jury."  Docket No. 81 at 65. Unfortunately, a juror may have reasonably construed this statement as permitting the jury to ignore my earlier instruction to disregard McKinley's testimony about being shot.  My

response to Ford's objection during the prosecutor's rebuttal may therefore have aggravated whatever degree of prejudice might have ensued from the prosecutor's statement had I remained silent.  *See United States v. Mastrangelo*, 172 F.3d 288, 295-98 (3d Cir. 1999) (reversing for prosecutorial misconduct where the district court's faulty curative instruction exacerbated the prejudice caused by a prosecutor's remark).

Third, I must evaluate the effect of the prosecutor's remarks in light of "the strength of the evidence against Ford."  As addressed above, the government's evidence against Ford was far from overwhelming, and a reasonable juror could have concluded, from that evidence, that Ford was not the individual from whom McKinley purchased cocaine base on November 10, 2005.  Unless a reasonable juror were to credit McKinley's testimony, he would be left without sufficient evidence from which to conclude beyond a reasonable doubt that Harold Ford, rather than one of the other individuals with whom McKinley negotiated drug purchases on November 10, sold cocaine base to McKinley that day.

Ultimately, having balanced these factors in considering the effect of  prosecutor's remarks during his rebuttal, I cannot say that I am left with a "'sure conviction that the error did not prejudice' the defendant."  *Zehrbach*, 47 F.3d at 1265.  In a trial that was interlarded with gratuitous attacks by both parties, it would hardly be surprising that the prosecutor was tempted, at times, to engage in inappropriate conduct.  Ford's defense,

-60-

and particularly the closing argument of his counsel, challenged the integrity of both the

prosecutor and the government's witnesses.  These challenges merited a vigorous

response.  Unfortunately, however, the prosecutor went beyond any  response that was

warranted.  The prosecutor's inappropriate comments bolstered the credibility of

witnesses whose testimony, in light of the weakness of the government's evidence, was

necessary to secure Ford's conviction.  Consequently, I must conclude that there is not a

high probability that the prosecutorial misconduct in this case did not contribute to the

jury's verdict.

## IV.  Conclusion

        In this opinion I have described two courtroom aspects of this case that made for a

difficult trial.  The first was the pervasive acrimony that colored the interactions between

the lawyer representing the United States and the lawyer representing Harold Ford.   The

second – closely related to the first – was the prosecutor's drumbeat of derision, not

simply for opposing counsel but for those lawyers, as a class, who are engaged in the

representation of criminal defendants, to the point of suggesting that such lawyers engage

in deliberate deception.  This was, in my view, the worst of the prosecutor's offenses.

The recitals, in his closing-argument-rebuttal, of statements he attributed to members of

the criminal defense bar could only have been intended to convey the view that criminal

defense attorneys have as their goals "confus[ing] the issue[s]" and preventing the

government from "making sense."  This belittling of the criminal defense process

extended also to the prosecutor's characterization of the defense of misidentification as a

defense "of last resort."[35]  By anecdote and innuendo, criminal defense lawyers were

portrayed for the jury as persons whose expected and habitual professional role is to

mislead the jury by distorting, or hiding, the truth through a criminal defense process that

encourages such deception.  For counsel for the United States to show such disrespect

and, indeed, disdain for crucial ingredients of constitutional processes developed over

centuries was inexcusable.

A reader of this transcript could well say that a prosecutor behaving in this fashion

should have been called to account, early and often, by the judge.  Such criticism would

be appropriate.  In reading over the transcript I found myself, at many points, troubled

that I had not stepped in and directed  the prosecutor to cease behaving in a fashion

signally inappropriate for a government's lawyer.  Too often I was too mild in reproof or

---

[35] Such an argument was not only inappropriate, it was false as a representation of
the value of asserting a defense of misidentification.  That innocent people are convicted
of crimes they did not commit is not a new or a controversial proposition.  *See, e.g.*,
Edwin Borchard, *Convicting the Innocent: Sixty Five Actual Errors of Criminal Justice*
(1932) (detailing sixty-five cases of wrongful convictions); Hugo Adam Bedau and
Michael L. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev.
21 (1987) (analyzing 350 cases from the 20th century in which defendants convicted of
capital or potentially capital crimes were later been found to be innocent); The Innocence
Project, www.innocenceproject.org (last visited April 20, 2009) (detailing activities of
organization, founded in 1992, whose efforts have led to the exoneration of 235 people
nationwide who had been wrongfully convicted).

simply directed the prosecutor to move on.  One could, therefore, argue that it is not merely unbecoming, but far too late in the day, for the judge to determine that the prosecutor committed misconduct.  But that begs the issue.  The question is whether the prosecutor's unhappy behavior may have caused substantial damage to the integrity of the trial, thus prejudicing the defendant.  With this in mind, one recognizes that the judge's unduly tepid response to the prosecutor's behavior was not likely to have done much to insure that the defendant was accorded the fair process that was his due.

Accordingly, because I believe that there is a significant possibility that the fairness of the jury's verdict may have been threatened by the prosecutorial vouching and attacks on the defendant's counsel, I will exercise my discretion to set aside the jury's verdict on count one of the indictment and grant Ford a new trial.